IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CR. NO. 1:11-CR-07-MHT-WC |
| v. | ) | |
| | ) | |
| PATRICIA ERVIN | ) | |
| and | ) | |
| MONTY ERVIN | ) | Sentencing: April 9, 2012 |
| | ) | |
| Defendants | ) | |

## GOVERNMENT'S CONSOLIDATED SENTENCING MEMORANDUM

The United States of America, by undersigned counsel, respectfully submits this Sentencing Memorandum in the above-captioned matter.

The Ervins engaged in a conspiracy to defraud the United States for more than a decade. Despite their testimony to the contrary at trial, the Ervins were driven by a refusal to comply with federal laws – in particular, to pay no federal income taxes despite earning millions of dollars in rental income and accumulating substantial assets – based on assertions that they were "sovereign" and therefore not subject to the jurisdiction of the federal government. For the reasons set forth herein, the United States requests that this Court sentence Monty Ervin and Patricia Ervin to the high end of the advisory sentencing Guidelines. Only a sentence that includes a lengthy prison sentence will reinforce to the Ervins that the law has consequences and serve to deter similarly situated individuals from violating federal laws.

8286537.1

# I.    BACKGROUND

The Ervins have engaged in a sophisticated conspiracy to defraud the United States for more than a decade.  They have structured transactions to avoid financial reporting requirements, placed assets and income in the names of trusts, claimed not be United States citizens, attempted to pay tax liabilities through fictitious instruments, filed frivolous tax returns with question marks, and threatened government officials.  Simultaneously, the Ervins earned millions of dollars in rental income and paid nothing in federal income taxes.  Since 1997 – the last time Monty Ervin and Patricia Ervin filed individual federal income tax returns – the Ervins have not paid a dime in federal income taxes.

### A.    *Properties*

Between 1997 and 2010, Patricia Ervin and Monty Ervin owned and managed Southern Realty & Property Management, LLC ("Southern Realty"), a property management company located at 400 West Washington Street, Dothan, Alabama and its successor, Southern Rental Property Management LLC[1] ("Southern Rental", collectively "Southern").  Southern managed over 200 pieces of rental property.  Southern only handled property owned by the Ervins.  Almost all of these properties were held in the names of nominee trusts set up by the Ervins and controlled by the Ervins.

In 1997, Patricia and Monty Ervin created several trusts and appointed friends and family to act as trustees, including Jack Rudy, Milissa Scott, Jeff Hargett, M.C. Spann, and Curtis Malone.[2]  According to the testimony and evidence, Albert Esposito sold trust packages to the

---

[1] On or about August 14, 2006, the Ervins signed an agreement forming Southern Rental Property Management LLC.  On or about December 31, 2006, the Ervins signed a document dissolving Southern Realty.
[2] The other trustee is Albert Esposito who allegedly sold the tax evasion scheme to the Ervins.  In 2004, Mr. Esposito was convicted of several fraud charges and is currently in a federal penitentiary.

8286537.1

Ervins and he also acted as a trustee on some of the trusts. The property placed into the trusts came from Patricia and Monty Ervin, who controlled every aspect of the trusts and, in fact, were trustees on the trusts. As to the 1997 trusts, the Ervins created a two-tier system. For example, Life Line Holdings trust had property placed into it and the beneficiary of Life Line Holdings trust was the Maggie Adams trust. The Maggie Adams trust, in turn, had as its beneficiaries the Ervins' children. The Ervins were trustees of the Maggie Adams trust. The trusts thus were essentially an elaborate labyrinth of entities designed to hide income and assets from the IRS.

Many of the trusts entered into management agreements with Southern Realty to manage the property and collect the rents. The agreements were not signed by the trustees but by Monty Ervin. (*See, e.g.,* Trial Ex. 201).

When it came to purchasing or selling properties, the transactions were handled by the Ervins. The Ervins paid for the property and received the gains from selling the property. The Ervins controlled Southern Realty which collected the rent from the property allegedly owned by the trusts. The Ervins also received the gains from the rental income. Based on the testimony, the so-called trustees and trusts never received any payment and had no idea about the purchases or sales of the properties. In order to hide their involvement from the IRS, Monty and Patricia Ervin were not listed as trustees of the trusts or as the true owners on any of the transactions.

For instance, according to warranty deeds, Earthie Farms Holdings with Milissa Scott as trustee owned 212 Dahlia Drive. Milissa Scott testified that she did not buy or sell this property and had no idea about the property. The property was sold for a substantial profit. Milissa Scott's name appears on all the closing documents, the HUD Form 1, the warranty deed, and the sales proceeds check. Milissa Scott did not sign any of those documents, had no idea about the

8286537.1

closing, and never received the check.  Rather, Patricia Ervin is the one who handled the sale and received the sales proceeds which were deposited into Southern Realty's bank account.  When an IRS Form 1099 was issued, it was issued in the name of Milissa Scott, as trustee for Earthie Farms Holdings.  An IRS Form 1099 is sent to the IRS to inform the IRS of potential income.  By placing title in Milissa Scott's name, the Ervins were able to hide their income.  This is just one example of many.  A sample of similar transactions is listed in Trial Exhibit 261.

In order to facilitate the transfer of property held in the names of the nominees, Patricia and Monty Ervin caused to be prepared false notarized warranty deeds, including the following:

| EXHIBIT NUMBER | DATE | PROPERTY | NOMINEE TRUST | NOMINEE TRUSTEE |
|---|---|---|---|---|
| 113 | 2/04/2004 | Ambassador Beach, Unit 228 | Star Brite Investment | Jack Rudy |
| 116 | 2/04/2004 | Ambassador Beach, Unit 230 | Star Brite Investment | Jack Rudy |
| 82 | 12/28/2005 | 212 Dahlia Drive | Earthie Farms Holdings | Milissa Scott |
| 100 | 05/09/2006 | Colonial Shores, Unit 109 | Star Brite Investment | Jack Rudy |
| 150 | 10/28/2005 | 75 Fain Street | Life Line Holdings | Jeff Hargett |
| 161 | 8/17/2006 | 80 Nomberg | Nebo Holdings | M.C. Spann |

The trustees testified that they did not sign any of these deeds.  According to the closing agents, they relied upon these notarized deeds to ensure the warranty deeds contained correct signatures.  Otherwise, the transactions would not have happened.

Patricia and Monty Ervin caused the sales proceeds of properties they held in the names of the trustees to be deposited into Southern Realty's bank accounts:

4

| EXHIBIT NUMBERS | DATE OF CHECK | PROPERTY | NOMINEE TRUST | AMOUNT |
|---|---|---|---|---|
| 316 | 2/09/04 | Ambassador Beach, Unit 228 | Star Brite Investment | $118,095.05 |
| 7 | 2/09/04 | Ambassador Beach, Unit 230 | Star Brite Investment | $118,259.90 |
| 329 | 11/01/05 | 75 Fain Street | Life Line Holdings | $54,761.31 |
| 330 | 12/27/05 | 212 Dahlia Drive | Earthie Farms Holdings | $65,774.91 |
| 322 | 5/11/06 | Colonial Shores, Unit 109 | Star Brite Investment | $257,833.92 |
| 322 | 5/17/06 | 80 Nomberg Road | Nebo Holdings | $50,314.96 |

Several of those checks were forged or used stamp signatures. None of the money ever went to the trustee listed on the check or closing documents.

As to the rental income, the Ervins attempted to conceal the rental income by structuring deposits and requiring payments in silver. In order to avoid detection by the IRS, Patricia Ervin structured cash deposits to avoid currency transaction reporting requirements. Patricia Ervin knew about the reporting requirements, likely from her employment as a bank teller, and intentionally structured transactions to avoid those reporting requirements. For instance, on or about February 3, 2006 through on or about February 10, 2006, as set forth below, Patricia Ervin structured and assisted in structuring a transaction with MidSouth Bank in Dothan, Alabama, by making, and causing to be made, cash deposits totaling $39,513 in individual amounts of $10,000 or less to avoid the filing of a Currency Transaction Report. Patricia Ervin also made 17 deposits in 2005 that were between $9,500 and slightly below $10,000. From December 2008,

8286537.1

through May 2009, the Ervins required tenants to pay rent with silver instead of United States currency.

Between 2004 and 2006, Patricia and Monty Ervin used funds drawn from Southern Realty's bank accounts to purchase several properties in their names.  When the properties were initially purchased, the Ervins were not under an IRS audit.  A sample of the properties purchased in their name and the purchase amount is listed in Trial Exhibit 262.  After being informed of an IRS audit, the Ervins transferred the properties from their names to the names of various trusts and to an LLC.  Unlike the trusts from 1997, the Ervins did not produce any trust creation documents during the investigation or at trial for these trusts.  No evidence was produced that these trusts existed beyond what was on the warranty deeds.  Milissa Scott, who is listed as the trustee for the trusts, testified that she had no idea about the purchases and no idea that she was a trustee for these properties.

*B.  Audit*

In 2006 and 2007, IRS Revenue Agent Susan Tyson conducted an audit of Southern Realty and the Ervins.

1.  Southern Realty Audit

As to Southern Realty, Revenue Agent Tyson dealt with Southern's accountant, Dan McCallister.  Revenue Agent Tyson received some documentation from Southern.  When she requested additional information about the so-called owners of the properties, *i.e.*, the trusts, Monty and Patricia Ervin refused to provide any documentation, such as trust documents or financial information.  Even though the Ervins controlled the trusts and were, for all intents and purposes, the true owners, Monty Ervin responded that the owners would not allow them to

8286537.1

provide such information.  (Trial Ex. 222). When asked how Monty Ervin pays for living

expenses, Monty Ervin simply responded, "God provides for Monty."  (Trial Ex. 222).

Revenue Agent Tyson prepared a deficiency for Southern and sent it to the company.

Monty Ervin had two responses.  First, Monty Ervin responded that the records given to

McCallister were so fatally flawed that they could not be relied on.  (Trial Ex. 224).  This letter

was just designed to delay and was false.  Throughout the trial, the Ervins emphasized that

Southern's records were "meticulous."

Second, when the letter did not work, the Ervins attempted to pay that tax liability with

several fictitious monetary instruments.  For instance, Trial Exhibit 197 is what purports to be a

$100 billion bond in which Monty Ervin signed and placed his thumbprint.  Monty Ervin also

prepared three other $1 million bonds in an attempt to pay his tax liabilities.  (Trial Exs. 291,

291, 312).  According to the bonds, the value of the bonds should be placed into a special

treasury account in the name of Monty Ervin.  The Government's expert explained that these

bonds are fictitious financial instruments and completely worthless.  There is no secret treasury

account.  Monty Ervin admitted on the stand that he knew those documents were false when he

sent them to the IRS and were designed to obstruct the IRS.

> 2.  <u>Monty and Patricia Ervin</u>

As to the Ervins, in June 2006, IRS Revenue Agent Susan Tyson sent correspondence to

Monty and Patricia Ervin informing them that they had not filed tax returns in several years and

requesting to set up a meeting to discuss the matter.  Monty and Patricia Ervin responded:

> *After an assiduous investigation of my records I have been unable to find any*
> *citizenship papers that I might be considered a citizen of the United States, or an*
> *application, contract, verified copy of a social security application, or privileged*
> *commercial association that has caused you to develop an expectation that I was*

> *required for filing a federal income tax return for the periods you listed on your*
> *letter.*

(Trial Exs. 232, 234). The Ervins both left letters addressed to the Social Security Administration at Revenue Agent Tyson's office which provided, "I do not remember making application for communitarian social security welfare benefits and I am certain the application is a forgery." (Trial Exs. 233, 235).

Around the same time, both Monty Ervin and Patricia Ervin recorded with the Houston County Probate Court a "Declaration of Fact Evidence for Dispelling Incorrect Presumptions Contained in Public Record." (Trial Exs. 35, 36). In these documents, the Ervins claimed, "I am not a citizen of 'the United States,'" but rather a "Sovereign Most Christian Prince" and a "Sovereign Most Christian Princess." (*Id.*)

In 2007, IRS Revenue Agent Tyson sent letters to the Ervins informing them that they had not filed their 2006 tax return and requesting another meeting. The Ervins responded to IRS Revenue Agent Tyson, stating:

> *I am not a member of the communist welfare trust called social security and*
> *therefore not subject to benefits and therefore there is no surplus for returning.*
> . . .
> *I am not a resident of this state. I live within the outer borders of the land called*
> *Alabama. I do not collect revenue for the federal administration and therefore I*
> *am not a taxpayer.*

(Trial Exs. 237, 240). Patricia Ervin also stated, among other things, "[y]ou have addressed mail to me attempting to cause me to consent to being a resident of a numbered plantation of a place called 'AL.' I am not a resident of a numbered plantation of a place called 'AL,'" and "I cannot accept mail that makes it appear that I acquiesce to being treated like a resident alien slave ward of the state residing on United States territory within the district called 'AL.'" (Trial Ex. 240).

8

Not once during the audit conducted by IRS Revenue Agent Tyson did Monty or Patricia Ervin ask Revenue Agent Tyson if the trust arrangement they created was valid or argue to that effect.  Rather, the Ervins actively refused to provide information regarding the trusts to Revenue Agent Tyson, despite her requests for such information, and instead corresponded with claims of "sovereignty" exempting them from compliance with federal tax laws.

Revenue Agent Tyson referred the matter to IRS criminal investigation and stayed on to assist the lead special agent investigating the criminal case.  As presented at trial, the Ervins threatened the special agent, warning him that he may be in violation of federal law for criminally investigating the defendants.  (Trial Ex.  294).  Subsequently, Monty Ervin threatened the special agent with "jail time," a "money penalty," and "dismissal from service" for speaking with Monty Ervin's friends, relatives, acquaintances, or anyone with whom Monty Ervin ever did business.  (Trial Ex. 297).

### C.  Flight

The evidence at trial also showed that Monty Ervin attempted to flee the country when he learned of the indictment.  Federal agents with the IRS's Criminal Investigation Division arrested defendant Patricia Ervin in connection with this case on January 28, 2011. On February 18, 2011, the Court summonsed defendant Patricia Ervin to appear March 2, 2011, for an arraignment pertaining to the Superseding Indictment, naming both her and her husband as defendants.  On March 2, 2011, defendant Patricia Ervin was arraigned on the Superseding Indictment, informed of the charges pending against both her and her alleged co-conspirator, defendant Monty Ervin, provided a copy of the Superseding Indictment through counsel, and released on bond.

9

In the interim, IRS-CI federal agents and the United States Marshals Service were engaged in a search for defendant Monty Ervin in an attempt to arrest him. The federal agents searched for Monty Ervin in his hometown of Dothan, Alabama, but did not find him. The United States Marshals Service arrested Monty Ervin on March 19, 2011, in Naples, Florida, ending a several-week manhunt that spanned multiple jurisdictions. During this time period, Monty Ervin made arrangements to acquire two PVC pipes full of gold worth approximately $350,000 buried in a field of property he owned. As evidenced by a notebook seized from his person incident to his arrest, Ervin had made arrangements to flee the country by boat, apparently for an English-speaking island off the coast of Honduras.

## II.    LEGAL STANDARD

Although the Sentencing Guidelines are no longer mandatory, both the Supreme Court and the Eleventh Circuit have made clear that sentencing after *United States v. Booker*, 543 U.S. 220 (2005), must begin with a properly calculated advisory Sentencing Guidelines range. *See Gall v. United States*, 128 S. Ct. 586, 596 (2007) ("[T]he Guidelines should be the starting point and the initial benchmark."); *Rita v. United States*, 127 S. Ct. 2456, 2464-65 (2007); *Booker*, 543 U.S. at 245-46; *United States v. Crawford*, 407 F.3d 1174, 1179 (11th Cir. 2005). The Supreme Court indicated that the judicial fact-finding necessary to calculate the advisory Guidelines range does not violate the Sixth Amendment. *Rita*, 127 S.Ct. at 2465-66. Thus, in calculating the advisory Guidelines range, this Court must make factual findings using the preponderance of the evidence standard, just as before *Booker*. *United States v. Garcia-Gonon*, 433 F.3d 587, 593 (8th Cir. 2006); *United States v. Pirani*, 406 F.3d 543, 551 n. 4 (8th Cir. 2005) (*en banc*). Next,

8286537.1

the district court must decide if a traditional departure under the Guidelines is appropriate, thus creating an advisory Guidelines sentencing range. *Plaza*, 471 F.3d at 930.

After calculating the advisory Guidelines range, the Court must consider that range along with all the factors listed in 18 U.S.C. § 3553(a) before arriving at the final sentence. *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007); *Plaza*, 471 F.3d at 930. "The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority." *Rita*, 127 S. Ct. at 2468 (2007); *see also Gall*, 128 S. Ct. at 597 (explaining that the sentencing court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing").

### III. <u>SENTENCING GUIDELINES</u>

The United States has reviewed the PSR and concurs with the guidelines calculations of the United States Probation Office, with the exception of the tax loss, to which the United States formally objects and argues is between $1 million and $2.5 million.

The main disputes between the parties before probation, and most likely before the Court, concern (a) the amount of the tax loss; (b) the sophisticated means enhancement; (c) an enhancement for obstruction of justice; (d) a role enhancement; and (e) defendants' position that they should receive a downward departure for extraordinary restitution.

A sentencing decision begins with a properly calculated Guidelines range. In particular, the United States calculates the Guidelines range as follows:

8286537.1

| | | Offense Level | |
|---|---|---|---|
| Guidelines Provision | Description | Monty Ervin | Patricia Ervin |
| § 2T1.1; § 2T4.1(I) | Tax Loss | 22 | 22 |
| § 2T1.1(b)(2) | Sophisticated Means | 2 | 2 |
| § 3C1.1 | Obstruction | 2 | 2 |
| § 3B1.1 | Aggravating Role | 4 | 3 |
| | Totals: | 30 | 29 |

A total offense level of 30 yields a sentence range of 97 to 121 months and an offense level of 29 yields a sentence range of 87 to 108 months.

### A. Criminal Tax Loss Computation

The major component of the Guidelines calculations in the instant case is the tax harm, which is the total amount of loss that was the object of the offense. U.S.S.G. § 2T1.1(c)(1). The tax loss is not reduced by any payment of the tax subsequent to the commission of the offense. U.S.S.G. § 2T1.1(c)(5). The tax loss for Sentencing Guidelines calculations does not include penalties and statutory interest. U.S.S.G. § 2T1.1, *Application Note 1*.

"[I]n calculating the amount of loss, the Guidelines require a district court to take into account 'not merely the charged conduct, but rather all "relevant conduct," in calculating a defendant's offense level.'" *United States v. Foley*, 508 F.3d 627, 633 (11th Cir. 2007); *see, e.g., United States v. Goverah*, 2011 WL 1409494 at * 4-5 (11th Cir. 2011) (unpublished) (including uncharged tax loss into total tax loss for sentencing purposes). "The guidelines do not require the government to make a fraud loss determination with precision; the figure need only be a reasonable estimate given the information available to the government." *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999); *see also United States v. Dominguez*, 109 F.3d 675, 676 (11th Cir.1997). As stated in the Guidelines, "[i]n some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines

8286537.1

contemplate that the court will simply make a reasonable estimate based on the available facts."
U.S.S.G. § 2T1.1, Application Note 1.

The parties are in agreement as to the tax loss for the years 2000 through 2006.  The
parties do not agree as to the tax loss for the tax years 2007 through 2009.

1.  <u>Tax Loss Theory</u>

As noted by the United States Probation Office, the United States is relying on two tax
loss theories – the distinction arising from limited information provided by the defendants for tax
years 2007 through 2009.

At trial, IRS Revenue Agent Susan Tyson testified as to the tax loss for the tax years
2004 through 2006.  Revenue Agent Tyson computed the income earned by the Ervins by
calculating the disbursements from Southern Realty and other entities to the Ervins.  The money
was used to purchase property in the name of the Ervins or in the name of a trust.  The United
States did not include any other distributions to the Ervins due to an inability to trace cash
withdrawals to the Ervins.  The United States also computed the capital gains and ordinary
income from the sale of property between 2004 and 2006.  Revenue Agent Tyson then deducted
depreciation expenses, standard deductions, exemptions, and itemized deductions.  Revenue
Agent Tyson also removed the sales proceeds and nontaxable items to ensure no double taxation
of sales proceeds.

Defendants have used this same theory for the tax years 2000 through 2009.  For the
2000 through 2006 tax years, the tax loss numbers as computed by the Defendant are comparable
to the numbers computed by the United States.  The Defendants' total tax loss for 2000 through

13

2006 is $1,103,659 and the United States' is $1,217,967. The United States does not object to the Defendants' calculations for the 2000 through 2006 tax years.

As to the 2007 through 2009 tax years, Revenue Agent Tyson has calculated the tax loss for the Ervins using a different method.[3] Beginning in 2006 and continuing forward, the Ervins were under an IRS audit and eventually a criminal investigation. A large portion of the correspondence occurred between June and August of 2007. (Trial Exs. 236-243). In 2007, the Ervins appear to have stopped purchasing property (or purchased property in nominees that the United States did not discover). However, the Ervins continued to receive about $1 million in rental income per year. The Ervins did not stop making money. Rather, they simply stopped buying property that the IRS could trace. As shown at trial, the Ervins had accumulated a large supply of gold worth hundreds of thousands of dollars (at least) and a large cache of weapons, ammunition, and food.

In order to capture the income earned by the Ervins, Revenue Agent Tyson used, as gross income, the total amount of rents received by the Ervins.[4] (Trial Ex. 263). Revenue Agent Tyson, in turn, deducted expenses and depreciation from the rents. As to expenses, Revenue Agent Tyson reviewed expenses for the years 2002 through 2006. She determined the average percentage of expenses compared to rental receipts for 2002 through 2006 and then used that percentage for other years. In sum, IRS Revenue Agent Susan Tyson determined the tax loss:

---

[3] Revenue Agent Tyson also computed the tax years 2000 through 2003 using the different method. The tax loss for those years is comparable to the tax loss as computed by Defendants.

[4] The United States did not calculate the profit and sale of any property transactions for these years. Based on the 2004 through 2006 years, any sales probably resulted in income to the Ervins. Thus, the lack of this computation is favorable to the Ervins.

14

8286537.1

| Year | Tax Loss |
|------|----------|
| 2007 | $139,469 |
| 2008 | $126,581 |
| 2009 | $125,015 |
| Total: | $391,065.00 |

The method used at trial did not reasonably capture the income earned by the Ervins during the years after they became aware of the audit and criminal investigation. The Ervins appeared to have changed their pattern of using money to expand their real estate holdings to using the money for other purposes, such as buying gold. The Ervins did not stop making money. They just used their income for other purposes that could not be easily traced. In total, the United States argues that the Ervins owed a total of $1,494,724 in federal taxes.

  2. <u>Carry Back Loss</u>

   The Defendants claim that the Ervins lost money between 2007 and 2009 and can carry back that loss to the prior tax years. In the civil tax context, a carry back loss can operate retrospectively to reduce or extinguish a tax previously due. Even assuming that the Court accepts the Defendants' tax loss figures for the 2007 through 2009 tax years, in a criminal matter, the Defendants may not carry back the loss to cover prior tax years and the tax loss is still therefore more than $1 million.

   The case law is clear that a defendant cannot use a carry back loss to defeat or mitigate a tax evasion conviction. *Willingham v. United States*, 289 F.2d 283, 288 (5th Cir. 1961); *United States v. Keltner*, 675 F.2d 602, 604 (4th Cir. 1982); *United States v. Wick*, 34 Fed. Appx. 273, 2002 WL 460393 at * 4 (9th Cir. Feb. 11, 2002) (unpublished). In *Willingham v. United States*, which is binding, the Fifth Circuit explained that the crime of tax evasion "is complete when with wilful intent, a false and fraudulent return is filed for a year as to which, with all the

benefits arising out of events up to that time taken in his favour, there would still be a tax due by him but for the fraud."  289 F.2d 283, 288 (5th Cir. 1961).  "Any adjustment that may be permissible resulting from subsequent losses does not prevent the fraud committed in the [earlier year] from being an attempt 'to evade or defeat any tax.'"  *Id.*

Not only would permitting the carry back loss allow a lucky loser to escape prosecution, it "would create an enormous opportunity for abuse."  *Keltner*, 675 F.2d at 605.  For instance, a taxpayer could falsify a return and refrain from claiming a net operating loss until prosecuted and if not prosecuted, could carry forward the loss.  *Id.*  Or a taxpayer with no net operating loss who falsified a return could in the event of a prosecution purchase a corporation with accumulated losses and apply it to his prior tax liability.  *Id.*

The Ervins claim the current case is different because the Ervins have not filed a tax return and that at the time they file one (which they have not), they are aware of the net operating losses.  A similar argument was rejected in *Keltner* and that rationale applies here.  In *Keltner*, the defendant argued that *Willingham* did not apply because the operating losses had accrued prior to the filing of the returns and that he was entitled to show all deductions available at the time of actual filing, rather than at the time filing was required.  *Keltner*, 675 F.2d at 605.  The Fourth Circuit found that, at the date the returns were to be filed, appellant had an obligation to pay the tax due.  *Keltner*, 675 F.2d at 605; *see also Manning v. Seely Tube & Box Co.*, 338  U.S. 561 (1950) ("From the date the original return was to be filed until the date the deficiency was actually assessed, the taxpayer had a positive obligation to the United States: a duty to pay its tax.").  The Fourth Circuit held, "[t]he fact that subsequent operating loss would have permitted him to file an amended return and obtain a refund did not permit him to bypass the requirement

16

of timely filing of a return indicating his income as of the date he was required to file." *Keltner*, 675 F.2d at 605.

Likewise, the Ervins had an obligation to pay the tax due on the statutory dates and had completed the crime of tax evasion on those dates. The subsequent losses do not permit the Defendants to defeat or mitigate their tax evasion convictions. The criminal tax loss should not be reduced due to the carry back losses.

Moreover, the Ervins were under IRS audit or criminal investigation since 2006. Now, only after being convicted, the Ervins wish to claim the amount of deductions they could have claimed for the years in question but did not claim due to their failure to file returns. The federal courts have routinely rejected attempts by defendant that the Court play "Monday Morning Tax Advisor" and permit him benefits he failed to request when required. *See, e.g., United States v. Chavin*, 316 F.3d 666, 677-79 (7th Cir. 2002) (noting that a court's consideration of unclaimed deductions would make the resulting tax loss calculations "speculative"); *United States v. Wu*, 81 F.3d 72, 75 (7th Cir. 1996) (declining "to make it the responsibility of the United States Courts to comb the books of convicted tax evaders seeking ways in which they could have lowered their tax liability and their sentences" and noting that "it is simply not our role to play 'Monday Morning Tax Advisor.'"); *United States v. Valentino*, 19 F.3d 463, 465 (9th Cir. 1994) (explaining that the tax loss calculation methodology in the Guidelines was designed to "make irrelevant the issue of whether the taxpayer was entitled to offsetting adjustments that he failed to claim.").

For instance, in *United States v. Delfino*, 510 F.3d 468 (4th Cir. 2007), the Fourth Circuit addressed the issue where the defendants appealed the district court's sentence claiming the court

erred "by not subtracting from the amount of the loss any deductions they could have claimed for the years in question but did not claim due to their failure to file returns." *Id*. at 472. The Fourth Circuit concluded that the Guidelines define "tax loss" as the "total amount of the loss that was the object of the offense (*i.e.*, the loss that would have resulted had the offense been successfully completed)." *Id*.; U.S.S.G. § 2T1.1(c)(1). Relying on that premise, the Fourth Circuit held that the object of the offense "means the loss that would have resulted had a defendant been successful in his scheme to evade payment of tax." *Delfino*, 510 F.3d at 472. Next, the Fourth Circuit addressed whether "a more accurate determination of the tax loss" requires the calculation of deductions before tax loss is determined. *Id*. at 473. The Court's analysis speaks directly to the facts at issue in this case: "The Delfinos chose not to file their income tax returns. They also chose not to cooperate with the initial IRS audit, at which time they could have claimed deductions to which they were entitled. By doing so, they forfeited the opportunity to claim these deductions." *Id*. Likewise, the Ervins, having chosen not to file their income tax returns and not to cooperate with the IRS's civil audit, have forfeited their opportunity to claim the carry back loss solely for purposes of attempting to lower the tax loss in the context of a criminal sentencing Guidelines calculation.

3. Failed to Include Disbursements

With respect to the 2007 tax year, Defendants failed to include all distributions made to the Ervins to purchase two properties. First, the Ervins used $81,425.06 to help purchase Bella Riva Condominium Unit 205. (Trial Exs. 130-133). Second, Monty Ervin purchased property in the name of House of Israel Ministry worth $193,000. (Bates Number 8538). In total, the Ervins

18

spent $274,425 to purchase two properties. Defendants do not take into account these
expenditures in their tax calculations.

    4. <u>State Tax Loss</u>

    The tax loss figure should also include state tax loss. Every Circuit which has done so
has concluded state tax loss that was "part of the same course of conduct or common scheme or
plan as the offense of conviction" is properly included as relevant conduct. *See United States v.
Yip*, 592 F.3d 1035 (9th Cir. 2010); *United States v. Powell*, 124 F.3d 655, 656 (5th Cir.1997);
*United States v. Campbell,* 2006 WL 6497975 at * 2 (N.D.GA. 2006) (unpublished). In this
case, the state tax loss arose from the same scheme or plan of conviction. As proven at trial, the
Ervins hid their income and assets through the use of nominees, *i.e.* the trusts, and through other
means, such as structuring. The Ervins did not file federal or state income tax returns, as a
witness from the Alabama Department of Revenue testified at trial. Their entire scheme was
designed to evade paying any income tax, either state or federal. Accordingly, the failure to pay
state income taxes constitutes relevant conduct. The United States Probation Office notes that
state tax loss information was not provided in discovery. The information giving rise to the
computations – the same information giving rise to the federal tax loss computations – was
provided in discovery. The only question requiring resolution by this Court is a legal one:
whether to include intended state income tax loss as relevant conduct consistent with legal
precedent.

    Revenue Agent Tyson prepared schedules for Alabama state tax loss for the tax years
2000 through 2006 using the tax loss figures provided by the Defendant. The United States
provided this information to defendants prior to filing this memorandum and is prepared to

8286537.1

present evidence at sentencing.  The total state tax loss for those years is $121,657.  The state tax loss for the 2007 through 2009 tax years is $49,523.

Thus, because defendants are not entitled to a loss carryback, because defendant's calculations exclude important income for the 2007 tax year, and because state tax loss should be included as relevant conduct, the intended loss falls squarely between $1 million and $2.5 million.

### B.  Sophisticated Means (U.S.S.G. § 2T1.1(b)(2))

Pursuant to U.S.S.G. § 2T1.1(b)(2), a two-level enhancement is warranted due to the use of sophisticated means to execute and conceal the offense.  The Sentencing Guidelines define sophisticated means as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. 2T1.1, Application Note 4.  "This inquiry necessarily involves a comparison between the present case and the 'routine' tax evasion case, a comparison identical in nature to the inquiry a district court makes in determining whether a mitigating or aggravating factor takes a case out of the heartland thereby justifying a sentencing departure."  *United States v. Barakat*, 130 F.3d 1448, 1457 (11th Cir. 1997).

This case is far from the "routine" tax evasion case and is the classic example of the use of sophisticated means to conceal tax evasion.  As proven at trial and set forth in the background section, the Ervins concealed their ownership in over 200 pieces of property by placing their property in various sham trusts.  The Ervins recruited friends or family to be the trustees on paper.  None of the trustees did anything.  Rather, the Ervins controlled everything but the public

8286537.1

paper trial concealed the Ervins' involvement at all.  In case anyone questioned the Ervins' control, the Ervins had management agreements executed with the trusts.  Those agreements gave the Ervins complete power, including the power to sell and purchase property.

The Ervins further hid these transactions by using their specialized knowledge of the real estate market.  When the Ervins needed the trustees' signatures, the Ervins used stamps of their signatures to sign documents or simply forged the signatures.  If the Ervins needed a document notarized to facilitate a property transaction, the Ervins had their employees falsely notarize documents with the forged or stamped signature of the trustees.  The notaries typically stated that the Ervins signed the deeds in the employees' presence, but the trustees did not.  The Ervins also structured cash deposits to avoid the filing of CTRs and, in turn, detection by the IRS.  Overall, the placement of property and income in the names of nominees, the use of signature stamps and forged signatures, the use of false notarized deeds, and structured cash deposits, among others, constituted a sophisticated scheme to conceal their income from the IRS.  *See, e.g. United States v. Clarke*, 562 F.3d 1158 (11th Cir. 2009) (upholding the application of the sophisticated means enhancement where defendant concealed income and transactions through the use of third-party accounts); *United States v. Campbell*, 491 F.3d 1306, 1315–16. (11th Cir.2007) (holding that the sophisticated means enhancement was not clear error where the defendant was found to have utilized campaign accounts and credit cards issued to other people to conceal cash expenditures); *United States v. Barakat*, 130 F.3d 1448, 1457 (11th Cir.1997) (agreeing with the district court's determination that the defendant's practice of filtering funds through his attorney's trust account constituted a sophisticated means of concealing tax evasion).

    *C.  Obstruction of Justice (U.S.S.G. § 3C1.1)*

8286537.1

Pursuant to U.S.S.G. § 3C1.1, a two-point enhancement for obstruction of justice is warranted because both defendants committed perjury on the stand and during the course of the conspiracy, the Ervins engaged in conduct designed to obstruct and impede the investigation and prosecution.[5]  Section 3C1.1 provides for a two level enhancement for defendants who "willfully obstruct[ ] or impede[ ], or attempt[ ] to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction."

    1.  <u>Perjury</u>

The Section 3C1.1 enhancement applies if a defendant commits perjury pertaining to conduct that forms the basis of the offense of conviction or provides materially false information to a judge or magistrate. U.S.S.G. § 3C1.1 cmt. n. 4(B), (F).  For purposes of applying this enhancement, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."[6] *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).  A matter is material where, as here, "if believed, [it] would tend to influence or affect the issue under determination."  *United States v. Singh*, 291 F.3d 756, 763 (11th Cir. 2002).

Both Monty and Patricia Ervin testified falsely under oath as to material matters.  Monty Ervin testified at trial that he was not a sovereign citizen, was not a tax protestor, and blamed the

---

[5] The flight by Monty Ervin does not qualify as obstruction of justice.  *See United States v. Wilson*, 392 F.3d 1243, 1247 (11th Cir.2004) ("flight alone is insufficient to warrant an enhancement under [§ 3C1.2].").  The Eleventh Circuit held that "successfully avoiding arrest, alone, does not warrant an enhancement for obstruction of justice.... [T]he § 3C1.1 enhancement does not apply to persons engaged in criminal activity who learn of an investigation into that activity and simply disappear to avoid arrest, without more." *United States v. Alpert,* 28 F.3d 1104, 1107 (11th Cir.1994).

[6] Four elements must be present in order for a court to make a finding that a defendant perjured himself: (1) the testimony must be under oath or affirmation; (2) the testimony must be false; (3) the testimony must be material; and (4) the testimony must be given with the willful intent to provide false testimony and not as a result of a mistake, con-fusion, or faulty memory. *Dunnigan*, 507 U.S. at 94;

8286537.1

various correspondence and probate filings that espoused sovereign citizen beliefs on Louis Mohr, a person he described as a "common-law attorney."  Monty Ervin explained that the letters, fictitious financial instruments, and other sovereign citizen filings came from Louis Mohr.  If the jury believed Monty Ervin that he did not consider himself a sovereign citizen and instead relied on the writings of Louis Mohr, the jury could have found that Monty Ervin acted in good faith and not willfully.

The evidence produced at trial established that Monty Ervin not only made sovereign citizen statements, but also acted in conformity with other sovereign citizens.  Monty Ervin proclaimed himself Governor of Alabama in its original jurisdiction and claimed in many documents that he was not a United States citizen, but a "sovereign Most Christian Prince."  The United States introduced testimony from an FBI expert witness who testified that Monty Ervin's actions and writings conformed with the actions of other self-proclaimed sovereign citizens.  The expert testified that Monty Ervin's writings were consistent with the belief of other sovereign citizens that there are two United States entities, one a corporate entity and one in its original jurisdiction.  The expert further explained that Ervin's own actions were consistent with other sovereign citizens.  Monty Ervin had a sovereign citizen license plate, a family crest on his property, stockpiles of food and ammunition, and used grammar and punctuation (*e.g.* brackets around zip codes) that are consistent with the paper filings of other self-proclaimed "sovereign citizens," based on testimony presented at trial.  In total, the evidence demonstrated that Monty Ervin expressed sovereign citizen beliefs and lived a life consistent with those beliefs.  Accordingly, the evidence showed that Monty Ervin did not simply rely on a "common law" attorney in good faith, but acted willfully.

8286537.1

As to Patricia Ervin, Ms. Ervin stated that she called each of the trustees before she used their signature stamps. This evidence went to the heart of the matter of whether the Ervins relied in good faith on Albert Esposito who purportedly advised them that the trusts were tax-exempt and that they could use signature stamps of trustees. If the trustees were informed of the decisions and gave permission for the use of the stamps, the evidence would support Patricia Ervin's argument that she acted in good faith and did not prepare false deeds and closing documents. On the other hand, if the trustees did not know anything about the transactions and the closing documents were false, then the evidence tended to show that Patricia Ervin did not act in good faith.

At trial, each of the trustees testified that, other than being asked to be a trustee, they did not remember any calls from Patricia Ervin asking to use their signature stamp. In fact, several of the trustees did not even know a stamp was made of their signature. Overall, the trustees testified that they did not have knowledge of the various property transactions and were not consulted in the property purchases or sales. The trustees did not recall any of the large checks that appear to have signature stamps on them, such as the $257,000 check allegedly endorsed by Jack Rudy. Likewise, Milissa Scott testified that she had no idea about a property transaction for the sale of property in the amount of $65,000 (212 Dahlia Drive). Ms. Scott's signature appears on the closing documents, but she did not sign them and had no idea of the transaction. The closing attorneys' records indicate that Patricia Ervin is the one who handled the transaction and received the checks. Patricia Ervin also testified that the more than twenty bank deposits between $9,800 and $10,000 was a coincidence – testimony that was clearly false and material to

8286537.1

the structuring allegations based on her background as a bank teller and her employee's testimony that Ms. Ervin instructed that all deposits were to be under $10,000.

These statements, and a number of other statements, show that both defendants committed perjury and should receive two-level obstruction enhancements.

2.    Investigation

In addition to committing perjury, as set forth in the Indictment and proven at trial, the Ervins engaged in conduct to obstruct and impede the IRS investigation into their failure to pay income taxes. "Obstructive conduct can vary widely in nature, degree of planning, and seriousness." U.S.S.G. § 3C1.1, comment. (n.3). The defendant need not be successful in his attempt to impede or obstruct the administration of justice. *United States v. Taylor*, 88 F.3d 938, 944 (11th Cir. 1996).

First, Monty Ervin attempted to pay their tax liabilities with several fictitious instruments. Exhibit 197 is purportedly a $100 billion bond in which Monty Ervin signed and placed his thumbprint. Monty Ervin also prepared three other $1 million bonds in an attempt to pay his tax liabilities. (Exs. 291, 292, 312). According to the bonds, the value of the bonds should be placed into a special treasury account in the name of Monty Ervin. The Government's expert explained that these bonds are fictitious financial instruments and completely worthless. There is no secret treasury account. Monty Ervin admitted on the stand that he knew those documents were false when he sent them to the IRS. On cross-examination, Monty Ervin admitted that his purpose in filing "bonded promissory notes" was to obstruct the IRS. An IRS fact witness testified that the IRS has received thousands of these fictitious bonds and have spent considerable resources handling all these frivolous documents. Even though the instruments are

8286537.1

worthless, the obstruction of justice enhancement applies in this case because Monty Ervin attempted to obstruct the IRS investigation through the use of fictitious instruments. *United States v. King*, (11th Cir. Nov. 2, 2011) (unpublished) (finding that the obstruction enhancement applied where a defendant attempted to influence officials who worked on his case by filing worthless and incomprehensible liens); *see also United States v. James,* 328 F.3d 953, 956-57 (7th Cir.2003) (obstruction-of-justice enhancement authorized where defendant made unsuccessful attempt to intimidate judge, prosecutor, witnesses, and court personnel by mailing copies of contracts requiring them to pay $500,000 for use of his name, which included references to Article 9 of Uniform Commercial Code, and judge inferred that defendant planned to file copies as liens against property owned by recipients).

Second, the Ervins filed frivolous correspondence to the IRS to delay and obstruct the investigation. The Ervins refused to provide Susan Tyson with any documents related to the trusts and by doing so, implied that the owners, not them, did not permit disclosure. The Ervins also sent Susan Tyson frivolous documents claiming that they were not United States citizens and claimed that could not accept mail addressed to "AL." This conduct was simply to obstruct the investigation. The Ervins sent to various IRS agents, including Susan Tyson and David Kelly, public questionnaires. These questionnaires challenged their authority to conduct the investigation and were designed to delay the process.

Monty Ervin went beyond just tactics to delay, but threatened the lead IRS special agent investigating him. On or about September 29, 2008, Monty Ervin sent correspondence to the IRS in which he warned the special agent that he may be in violation of federal law for criminally investigating defendants. (Trial Ex. 294). In a letter dated February 12, 2009, Monty

8286537.1

Ervin told the special agent, "[y]ou do not have permission to talk to my friends, relatives, acquaintances or anyone that I have ever done business with. And you doing so without my permission could result in jail time, money penalties, and dismissal from service for you." (Trial Ex. 297). The conduct of the Ervins during the investigation was designed to obstruct the investigation and warrants two-level enhancements.

### D. Aggravating Role (U.S.S.G. § 3B1.1)

Pursuant to U.S.S.G. § 3B1.1(a) and (b), Monty Ervin is due a four-level increase for being the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, while Patricia Ervin should receive a three-level increase for being a manager or supervisor of that criminal activity. Section 3B1.1 outlines two situations in which a defendant's leadership role merits an enhancement, one in which he plays a leadership role in a criminal activity involving five or more participants and one in which the operation is "otherwise extensive." *United States v. Holland*, 22 F.3d 1040, 1045-46 (11th Cir. 1994). The government must prove the existence of a leadership role by a preponderance of the evidence. *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993). Both prongs are satisfied in this case.

### 1. Participants

To qualify for this enhancement, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1, cmt. n. 2; *see also United States v. Glover*, 179 F.3d 1300, 1302 (11th Cir.1999) (stating that, for the § 3B1.1(c) enhancement to apply, the defendant must have "assert[ed] control or influence over at least ... one participant"). A "'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." *United States v. Holland*, 22 F.3d 1040, 1045

27

(11th Cir. 1994) (quoting U.S.S.G. § 3B1.1, comment (n.1)).  '[P]articipation' under the

aggravating and mitigating role guidelines implies criminal liability and intent, that the

individual be an actual member of the plan or conspiracy." *United States v. Costales*, 5 F.3d

480, 484 (11th Cir. 1993); *see also United States v. Simpson*, 228 F.3d 1294, 1298 (11th Cir.

2000).  "When determining the number of participants, a defendant is considered to be one of the

five." *Holland*, 22 F.3d at 1045. "[S]upervision of an unwitting individual cannot justify an

enhancement." *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001).

In this case, there are more than five participants, including Monty Ervin, Patricia Ervin,

Albert Esposito, Louis Mohr, Amy Hardy and Todd Ward.  Albert Esposito sold the Ervins the

illegal trust packages that the Ervins used to evade paying their taxes.  Esposito sold these trust

packages as a way for the Ervins to be free from taxes to hide their assets from the IRS.  Esposito

was convicted of several criminal fraud charges and is currently incarcerated.   The Ervins also

retained a signature stamp with Esposito's signature and, even after Esposito was incarcerated,

the Ervins used the stamp on various legal documents, including property deeds.  Based on the

Ervins' testimony, Louis Mohr provided the Ervins with various frivolous filings, including

some of the fictitious financial instruments.  Louis Mohr claimed to be a common-law attorney

and when he came to Dothan, Alabama, he stayed with the Ervins.  The Ervins used the letters

and bonds prepared by Mohr to obstruct and impede the IRS.  Mohr, no doubt, knew that the

letters only had one purpose: to obstruct the IRS.

The testimony and evidence produced at trial established that Amy Hardy was a

participant in the criminal activity.  Amy Hardy worked at the Ervins' company, Southern

Realty, from 2005 through 2009.  Amy Hardy worked in the office, primarily with Patricia

Ervin, and followed the directions from both Ervins. Throughout her employment, Hardy knew that the Ervins structured their business to hide money from the IRS and used her to help hide that money.

With respect to the financial side of the business, Hardy explained that she received rent from tenants, including cash. Hardy provided the cash to Patricia Ervin. Patricia Ervin would normally prepare the deposit slips and on occasion, Hardy would prepare the deposit slips. Hardy explained that Patricia Ervin instructed her to not deposit more than $10,000 in cash at the bank on any given day so the IRS would not know about the money. With respect to the trusts and properties, Hardy knew that the trusts were designed to hide the Ervins' control of the property. Hardy testified that Monty Ervin told her that they put properties in trusts so that their names were not attached to the property. Hardy testified that she knew that the Ervins had signature stamps made of the trustees and that those stamps were located in Patricia Ervin's office. To help facilitate the transactions, Patricia Ervin instructed Hardy to notarize false warranty deeds. For instance, Hardy notarized a warranty deed (Trial Ex.100) in which Jack Rudy's, Curtis Malone's, and Milissa Scott's signatures appear on the document. Those signatures were stamped on the document using the signature stamps referenced above. The trustees and witnesses who allegedly signed the document in her presence did not sign in her presence and she knew it. The notary statement provided that Jack Rudy, as trustee, signed the document and gave his driver's license to Hardy. Hardy admitted that Jack Rudy did not hand her his driver's license and did not sign the document. The warranty deed was false. Patricia Ervin ordered Hardy to notarize that document and many others.

29

The false notary assisted the Ervins in hiding their interest in the property transfer.  The closing agent for the Colonial Shores property testified that she relied upon the accuracy of the notary when she accepted the warranty deed.  If she knew the warranty deed was not properly notarized, it could have impacted the sale.  Hardy's assistance in knowingly preparing false notary deeds helped the Ervins hide their assets from the IRS and Hardy did as the Ervins instructed.  Hardy also testified that, at some point in time, Monty Ervin directed her to open up a bank account with Headland Bank and list the account under her name.  The bank account in turn would receive the rental income Southern Realty collected and pay the bills of Southern Realty.  Monty Ervin explained that the purpose of the account was to hide money from the IRS.  Hardy, in essence, acted as a sham owner to help the Ervins hide their income from the IRS.

Likewise, Todd Ward admitted to falsely notarizing deeds at the instruction of Monty Ervin and Patricia Ervin and to structuring financial deposits in earlier years when he worked at Southern Realty.

### 2. Otherwise Extensive

Even where the criminal activity involved less than five participants, a Section 3B1.1(a) enhancement applies where the defendant played a leadership role and the operation is "otherwise extensive."  "[O]therwise extensive," includes "all persons involved during the course of the entire offense are to be considered.  Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  U.S.S.G. § 3B1.1, commentary n. 3.  In determining if a conspiracy is "otherwise extensive," the courts look toward "a number of factors relevant to the extensiveness

determination, including the length and scope of the criminal activity as well as the number of persons involved." *Holland*, 22 F.3d at 1046.

As set forth at trial, the criminal activity was quite complex, involving over 40 trusts, numerous nominee trustees, over 200 properties, over nine million dollars in rental income, multiple property transactions, over the span of more than ten years. *United States v. Gupta*, 463 F.3d 1182, 1198-99 (11th Cir. 2006) (finding that a criminal activity was otherwise extensive where it involved seven corporations, numerous straw owners, Medicare reimbursements of over $15 million, and repeated failure to disclose related party status over a seven-year period."). To perpetrate their conspiracy, the Ervins used a large number of unwilling participants. The Ervins recruited several of their friends and family to act as trustees for the trusts. Milissa Scott, Jeff Hargett, Curtis Malone, Jack Rudy, and Mary Catherine Spann each testified that he or she basically had no idea about the trusts and were not involved in the property transactions. At most, some of the trustees testified that they agreed to be a trustee as a favor and were told by Monty and Patricia Ervin that they would not have to do anything. The trustees testified that they basically did not do anything.

The conspiracy involved many other individuals. In addition to Amy Hardy and Todd Ward, the evidence presented at trial proved that Dean Williams worked for the Ervins and notarized false warranty deeds. The Ervins directed property they purchased at foreclosure sales to be placed into the names of various sham trusts. The Ervins used closing lawyers to handle closings for property held in the names of the trusts. The Ervins hired a local attorney named John Peacock to prepare tax returns that, rather than containing figures which could be used to calculate tax liability, instead contained question marks and statements such as "we

8286537.1

don't know" in areas where various figures should have been, all in an effort to obstruct the IRS investigation.  The evidence demonstrates that the case was "otherwise extensive."

       3.  <u>Leadership Roles</u>

The evidence presented at trial established that Monty Ervin was the organizer and leader of this criminal activity and that Patricia Ervin was a manager or supervisor of the criminal activity.  Monty and Patricia Ervin each took responsibility for handling certain functions of the conspiracy.  "When a conspiracy involves only two participants, each participant can be a 'organizer, leader, manager, or supervisor' in the criminal conduct when each participant takes primary responsibility for a distinct component of the plan and exercises control or influence over the other participant with respect to that distinct component of the plan."  *United States v. Yeager*, 331 F.3d 1216, 1227 (11th Cir.  2003).

Monty Ervin took the lead in organizing and creating the trust structure the Ervins used to hide their assets.  Monty Ervin had the contacts with Albert Esposito and he is the one that directed Patricia Ervin to sign the trust documents and go along with the trust system.  When the Ervins were audited, Monty Ervin handled the audit.  He dealt with their CPA, "common-law attorney" Louis Mohr, and John Peacock.  Patricia Ervin testified that Monty Ervin gave her letters to sign that were written by Mohr.  Patricia Ervin testified that she did not read them, but signed the documents at Monty Ervin's direction.   With respect to the question mark tax returns, Monty Ervin had John Peacock prepare the returns and directed Patricia Ervin to sign the returns. Patricia Ervin testified that she did not read the return, but just signed it.

Monty Ervin did not just lead Patricia Ervin.  As set forth above, Monty Ervin took a leadership role with respect to Amy Hardy.  Monty Ervin instructed Hardy to open up a bank

8286537.1

account in her name to hide money from the IRS.  Monty Ervin also instructed Hardy to accept rent in silver to hide money from the IRS.

Patricia Ervin, on the other hand, managed the financial side of the conspiracy, including structuring cash deposits to avoid detection and handling the property transactions to avoid detection by the IRS.  Patricia Ervin handled the deposits of cash and made sure that no deposits were over $10,000 in order to avoid reporting requirements.  To that end, Patricia Ervin ordered Amy Hardy and Todd Ward to makes sure that no cash deposit was over $10,000 on any given day.  When it came time to selling property, Patricia Ervin handled the sale.  For instance, in the sale of property titled in the name of Earthie Farms Holdings, Patricia Ervin directed the sale and handled the proceeds.  Patricia Ervin obtained the closing documents from the closing attorney, James Farmer, and, in turn, directed Amy Hardy to falsely notarize the warranty deed.  The warranty deed has Milissa Scott's stamp signature on the document when the notary declares it was notarized in Ms. Hardy's presence.  Patricia Ervin received the sales proceeds from Farmer. The check has Milissa Scott's stamp signature on it and was deposited into Southern's bank account.  (Trial Ex. 330).

## IV.    RESTITUTION

As to restitution, pursuant to 18 U.S.C. § 3663A, restitution is limited to only the loss associated with the counts of conviction.  *Hughey v. United States*, 495 U.S. 411, 413 (1990). Restitution cannot be ordered with respect to "relevant conduct."  *United States v. Scott,* 250 F.3d 550, 553 (7th Cir. 2001) (noting that "relevant conduct" may not be the basis of a restitution award under the MVRA unless it is also "charged [convicted] conduct" or covered in a plea agreement); *United States v. Campbell*, 106 F.3d 64, 69-70 (5th Cir.1997) ("relevant conduct"

8286537.1

provisions of guidelines are inapplicable to determination of amount of restitution); *accord Allman v. United States*, 2005 WL 3263300 (S.D. Ohio Nov. 30, 2005). The loss is limited to the actual loss incurred by the United States. Accordingly, the United States is only seeking the tax due and is not seeking the interest and penalties. The restitution amount for the Ervins for the tax years 2000 through 2009 is $1,494,724.

Moreover, a district court must state a sum certain that is to be paid as restitution. The court may not delegate the determination of a sum certain to another body such as the IRS. *United States v. Looney*, 152 Fed. Appx. 849, 860 (11th Cir. 2005) (unpublished) (district court could not order restitution in an amount to be determined by the IRS, but must specify the amount due); *United States v. Butler*, 297 F.3d 505, 518 (6th Cir. 2002) (district court could not order restitution in an amount "To be determined thru tax court or IRS."). Accordingly, the United States requests that a sum specific be listed as restitution.

## V.    STATUTORY SENTENCING FACTORS

Considering the large tax loss, the scope of the Ervins' actions, and the importance of deterrence in the context of criminal tax prosecutions, the United States requests the Court to impose a sentence at the high end of the guideline range for both Monty Ervin and Patricia Ervin. Such a sentence is reasonable and consistent the sentencing factors identified in Title 18, United States Code, Section 3553(a).[1]

---

]   The Section 3553(a) factors include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed-
  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
  (B) to afford adequate deterrence to criminal conduct;

8286537.1

Defendants' crimes are serious and fall squarely within the class of cases to which the applicable Guidelines provisions are addressed. As has been presented in great detail in various motions and at trial, defendants, for more than ten years, conspired together to avoid paying taxes on more than $9 million of rental income they earned from their real estate business. They hid their money and assets by using an elaborate labyrinth of trusts and nominee trustees, through a series of sham paper transactions having no economic substance, and by flat-out obstructing the IRS in its efforts to assess and collect federal income taxes from them.

The government's recommendation of a within-Guidelines sentence is based in part on the fact that such a sentence properly reflects the accumulated wisdom and expertise of the Sentencing Commission and serves the vital goal of uniformity and fairness in sentencing – especially in the context of federal tax crimes. While the Guidelines now serve as one factor among several, the Sentencing Commission continues to "fill[] an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" *Kimbrough v. United States*, 128 S. Ct. 558, 574 (2007) (quoting *United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court has acknowledged that, "in the ordinary case,

---

        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed ... medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for-
        (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...;
(5) any pertinent policy statement ...;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct....

8286537.1

the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough*, 128 S. Ct. at 574 (quoting *Rita v. United States*, 127 S. Ct. 2456, 2465 (2007)). Further, the advisory Guidelines are the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. In sum, all of the § 3553(a) considerations favor the imposition in this case of a within-Guidelines sentence.

In contrast with most other nations, the United States' tax system depends to an extraordinary degree on voluntary compliance with the law. Taxpayers are expected to truthfully report their income to the IRS, and pay their fair share. To that end, the Sentencing Commission has recognized the importance of deterrence in criminal tax cases: "Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines." USSG §2T1.1, Introductory Commentary. A guideline prison sentence would send a powerful message to individuals who hide their money in trusts and who use abusive trusts to evade paying their fair share of taxes. "[T]he goal of deterrence [in a tax prosecution] rings hollow if a prison sentence is not imposed," *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006), and in this case, a lengthy prison sentence is critical from the standpoint of deterrence.

Based on evidence presented at trial, the Ervins' conduct was driven in substantial part by assertions of "sovereignty" and a flat-out refusal to comply with federal laws. A sentence that includes a lengthy prison term is critical in this case to deter similarly situated individuals in the Middle District of Alabama – in particular, other self-proclaimed "sovereign citizens" who refuse to pay their federal taxes and otherwise comply with federal law. This Court's sentence

36

should reinforce to these individuals that this kind of conduct will not be tolerated and that the law applies equally to all.

In sum, the Government respectfully submits that in the instant case, full consideration of the section 3553(a) factors confirms the wisdom of the Sentencing Commission, and supports the imposition in this case of a sentence at the high end of the advisory Guidelines.

## CONCLUSION

For the reasons set forth above, full consideration of the 18 U.S.C. § 3553(a) factors supports the imposition of the Guidelines-recommended punishment as to both Defendants. Accordingly, the United States respectfully recommends that both Monty Ervin and Patricia Ervin be sentenced at the high end of the Guidelines. Further, for the reasons set forth above, the United States recommends that the Court order Defendants to pay restitution to the United States Treasury, as a joint and several obligation, in the amount of $1,494,724. Finally, the United States defers to the Court with respect to the imposition of a punitive fine.

Respectfully submitted,

SANDRA J. STEWART,
ACTING UNITED STATES ATTORNEY

*/s/ Justin K. Gelfand*
JUSTIN K. GELFAND
MICHAEL C. BOTELER
Trial Attorneys
U.S. Department of Justice, Tax Division

TODD BROWN
Assistant United States Attorney

8286537.1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CR. NO. 1:11-CR-07-MHT-WC |
| v. | ) | |
| | ) | |
| PATRICIA ERVIN | ) | |
| and | ) | |
| MONTY ERVIN | ) | |
| | ) | |
| Defendants | ) | |

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 2, 2012, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing

to all counsel of record.

Respectfully submitted,

<u>/s/ Justin K. Gelfand</u>
JUSTIN K. GELFAND
Trial Attorney
Department of Justice, Tax Division
Southern Criminal Enforcement Section
601 D Street, N.W.
Washington, D.C. 2004
Tel:    (202) 616-9832
Fax:    (202) 514-0961

8286537.1